**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| MARINE ELECTRIC SYSTEMS, INC., a Delaware corporation, and HARRY EPSTEIN,<br><br>Plaintiffs,<br><br>v.<br><br>MES FINANCING, LLC, a Louisiana limited liability company, WALTER MORALES, JAMES HAYES and WORACHOTE SOONTHORNSIMA,<br><br>Defendants. | Civil Action No.: 22-2643 (JXN) (MAH)<br><br>**OPINION** |

**Neals**, District Judge

This matter comes before the Court upon a Motion for a Preliminary Injunction[1] (ECF No. 28-1 at 137-208) by Plaintiffs Marine Electric Systems, Inc. ("Marine Electric"), and Harry Epstein ("Epstein") (collectively, "Plaintiffs"), against Defendants, MES Financing, LLC ("MESF"), Walter Morales ("Morales"), James Hayes ("Hayes"), and Worachote Soonthomsima ("Ob") (collectively, the "Defendants"), seeking to enjoin Defendants from conducting a sale of Epstein's stock in Marine Electric or otherwise attempting to foreclose on Marine Electric's assets or taking any action against Marine Electric based on the defaults asserted by Defendants.

The Court having reviewed the parties' submissions and having heard oral argument, and for the reasons set forth below, Plaintiffs' Motion for a Preliminary Injunction is **GRANTED.**

[1] Plaintiff's Order to Show Cause application having been removed to this Court pursuant to Defendants' Notice of Removal (ECF No. 1); and the Court, upon the mutual consent of the parties having entered an Order temporarily staying the action and the Sale pending a hearing on the Order to Show Cause application (ECF No. 6), on May 16, 2022, this Court ordered that Plaintiffs' Order to Show Cause application shall be treated as a motion for a preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure. (ECF No. 13.)

## I. BACKGROUND

Plaintiffs seek this Court's intervention to enjoin MESF from conducting a private sale of Epstein's stock in Marine Electric based on "wholly manufactured defaults" under certain loans and completing Defendants' alleged conspiracy to "wrestle ownership of the company from Epstein." (ECF No. 28-1 at 141.) Plaintiffs predicate their right to relief upon Defendants' alleged breaches of their fiduciary duties and obligations owed to the Marine Electric and Epstein personally. (*Id.* at 2-136, Verified Complaint ("Compl.") ¶ 1.)

Plaintiff Marine Electric, a Delaware corporation with its principal place of business in New Jersey, is one of the oldest Department of Defense contractors in the country, primarily engaged in manufacturing equipment and products for the United States Navy. (*Id.* ¶¶ 9, 18.) Plaintiff Epstein, a resident of New Jersey, is Marine Electric's Chief Executive Officer ("CEO"), board member, and majority stockholder with a 54.8% ownership interest in the company. (*Id.* ¶¶ 1, 10, 19.) Defendant MESF, a Louisiana limited liability company, is a lender to Marine Electric and the second largest stockholder in the company with a 36.5% ownership interest. (*Id.* ¶ 11.) MESF controls two out of five board seats for Marine Electric, one of which belongs to Defendant Hayes. (*Id.* ¶ 20.) Defendant Hayes, a resident of Pennsylvania, is a board member and former Chief Operating Officer ("COO") of Marine Electric.[2] (*Id.* ¶ 13.) Defendant Ob, a resident of Illinois, is a Principal at VentureSpire Group, LLC ("VentureSpire"). (*Id.* ¶ 14.) Venture Spire is a lender of Marine Electric and a has an 8.6% ownership interest in the company. (*Id.* ¶¶ 2, 21.)

Prior to serving as Marine Electric's COO, Hayes had a pre-existing relationship with Morales who in turn had a pre-existing relationship with VentureSpire and its Director Ob. (ECF

[2] Hayes resigned as COO for Marine Electric on February 10, 2022. (Compl. ¶¶ 31-32.) Hayes is currently employed by MESF. (ECF No. 32-2, Ex. B, Deposition Transcript of J. Hayes dated June 30, 2022 ("Hayes Dep.") 10:19-22.)

No. 28-1, Certification of Scott Weeber, CPA ("Weeber Cert.") ¶ 4–8.) Plaintiffs allege that Defendants have conspired with each other to take over Marine Electric "by manufacturing a default under certain loan agreements so that MESF can sell Epstein's stock in the company." (Compl. ¶ 2.)

The Verified Complaint outlines the history of the subject loans as follows:

1. The MESF Loan

On August 21, 2019, JOMT Holding LLC ("JOMT") provided a loan to Marine Electric in the principal amount of $525,000. (Compl. ¶ 34, Ex. A.) The loan with JOMT is secured by a Loan and Security Agreement and a Pledge Agreement under which Epstein pledged his equity interest in Marine Electric to secure the loan. (*Id.* ¶ 35.) On or about November 7, 2019, Defendant MESF became a lender to Marine Electric, when JOMT transferred and assigned its rights and obligations under the loan to MESF. (*Id.* ¶ 36.)

On March 10, 2021, Marine Electric provided MESF with a $563,331.74 Note (the "MESF Note") and entered into a Loan and Security Agreement with MESF, which restated and replaced the loan with JOMT (the "MESF Loan"). (*Id.* ¶ 37, Ex. C.) Plaintiffs claim that the MESF Loan was fully paid off on February 28, 2022, however, MESF has failed to return Epstein's stock. (*Id.* ¶ 38.)

2. The VentureSpire Loan

According to the Verified Complaint, in 2020, Defendants Morales and Hayes, then COO of Marine Electric, secured a $3.5 million loan from Defendant Ob's company, VentureSpire, for Marine Electric to acquire a company called Aerospace Industries, LLC ("Aerospace"). (*Id.*) On March 10, 2021, Marine Electric provided a Promissory Note to VentureSpire and executed a Loan and Security Agreement with VentureSpire (the "VentureSpire Loan"), for the Aerospace

acquisition. (Compl. ¶ 39. Ex. D.) The VentureSpire Loan provides, in relevant part, that "the Lender may, in its sole discretion, elect to provide Borrower with additional time in which to cure a breach or default." (Compl. ¶ 40, Ex. D., Section 5.1 (b) of the VentureSpire Loan Agreement.)

Plaintiffs claim that Morales requested that Hayes be responsible for conducting due diligence in connection with the acquisition of Aerospace, "which turned out to be a disaster." (*Id.*) After the deal was completed, Plaintiffs discovered that Aerospace's business was "essentially worthless." (*Id.*) Following the Aerospace acquisition, Marine Electric was facing cashflow and supply chain issues as well as a significant debt repayment obligation of $ 49,850.61 per month." (*Id.* ¶¶ 30, 42.)

Hayes engaged in discussions with Ob regarding the VentureSpire loan payments. (*Id.* ¶ 42.) Plaintiffs claim that Hayes assured Epstein and Marine Electric's Chief Financial Officer, Scott Weeber ("Weeber"), that VentureSpire had agreed to permit Marine Electric to delay certain payments under the VentureSpire Loan so that the company could pay its vendors and make payroll. (*Id.* ¶ 3.) Relying on these assurances, Marine Electric delayed two payments to VentureSpire in August and September of 2021. (*Id.*) Notwithstanding, VentureSpire sent Marine Electric a Notice of Default and Acceleration dated September 15, 2021, (the "September 2021 Default Notice"). (*Id.* ¶¶ 4, 46.) Plaintiffs allege that for a month MESF concealed from Marine Electric that MESF had become the holder of the VentureSpire Loan on September 16, 2021, while Morales was seemingly attempting to help Epstein negotiate a forbearance with VentureSpire, (Compl. ¶ 48; ECF No. 32-1, Ex. A, Declaration of H. Epstein ("Epstein Dec.") ¶¶ 12-14.) As a result, on October 7, 2021, Marine Electric made a payment to VentureSpire to cover the missed payments, including the late fees, which brought Marine Electric current on the loan. (*Id.* ¶ 47.)

Plaintiffs claim VentureSpire accepted the payments without objection, and that Marine Electric has "been current on the loan ever since." (*Id.* ¶ ¶ 3, 47.)

3. The Small Business Association ("SBA") Loan

On June 15, 2020, Marine Electric obtained a $150,000 loan from the SBA (the "SBA Loan"). (*Id.* ¶ 41.) In September 2021, Marine Electric increased its borrowings under the SBA Loan to $500,000. (*Id.*) Plaintiff claims that the board and MESF approved this additional funding. (*Id.*) On February 15, 2022, Marine Electric further increased its borrowings under the SBA Loan to $2 million. (*Id.*) Again, Plaintiffs claim that this additional funding was approved by the board and MESF through Morales. (*Id.*)

4. The Fifth Loan Modification

On or about October 28, 2021, Morales, on behalf of MESF, presented Epstein with a Fifth Loan Modification Agreement (the "Fifth Loan Modification"). (*Id.* ¶ 49.) Plaintiffs note that the Fifth Loan Modification makes no mention of any default but simply restates the Loans, the parties' obligations thereunder, and explicitly states that VentureSpire Loan is "in full force and effect." (*Id.* ¶ 50.) Epstein claims he never agreed, in connection with the Fifth Loan Modification or otherwise, to grant a pledge of his stock to secure the VentureSpire Loan. (*Id.* ¶ 5.)

5. The Alleged Defaults

According to Plaintiffs, after accepting six months of timely payments, MESF issued a demand for full payment of the indebtedness on the Loans based on Plaintiffs' "2021 alleged default" of the VentureSpire Loan and "a false claim that MESF did not authorize Marine Electric to enter [the $1.5 Million" SBA Loan [], thereby triggering an independent default." (*Id.* ¶ 5.) Plaintiffs claim that "based on these alleged defaults," on April 20, 2022, MESF noticed a private sale of Epstein's stock in Marine Electric ("Stock Sale") for May 6, 2022. (*Id.*; ECF No. 28-1 at

135.) Plaintiffs argue that to justify the Stock Sale, MESF sent Epstein a Notice of Continuing Default, Acceleration, and Reservation of Rights letter dated April 20, 2022 (the "April 2022 Default Notice") claiming technical defaults under the Loans. (*See* ECF No. 28-1 at 131.) The April 20, 2022 letter states that,

> [Plaintiffs'] default under the Venturespire Loan Agreement and Venturespire Note constitutes a default under the MESF Loan Agreement and MESF Note. Additionally, under the terms of the MESF Loan Agreement, Borrower is prohibited from incurring any additional indebtedness without Lender's prior written approval. Despite that prohibition, Borrower obtained a secured loan from the Small Business Administration without Lender's prior approval, which unapproved loan constitutes an additional Event of Default under the MESF Loan Agreement and MESF Note.

(*Id.* at 132.) Plaintiffs claim that MESF's asserted grounds for default are "completely manufactured for personal gain." (*Id.* at 142, 145.)

On May 5, 2022, a day before the scheduled sale of Epstein's private stock and prior to the state court's adjudication of Plaintiff's Emergency Order to Show Cause Application ("OTSC"), Defendants MESF and Morales removed this action to this Court. (*See* ECF No. 1, Notice of Removal.) Upon removal, Plaintiffs filed an application requesting an emergency hearing on their OTSC. (*See* ECF No. 3.) The Court granted Plaintiff's application and held a hearing with the parties. (*See* ECF Nos. 4-5.) During the hearing, the parties consented to stay of the Stock Sale. As a result, the Court issued a Temporary Stay Order dated May 5, 2022, restraining the May 6, 2022 Stock Sale, by the mutual consent of the parties pending a hearing on Plaintiffs' OTSC. (*See* ECF No. 6.) Additionally, the Court directed the parties to meet, confer, and submit a proposed briefing and limited discovery schedule in connection with Plaintiffs' OTSC application. (*See* ECF No. 6.)

On May 16, 2022, the Court issued an Order setting briefing and initial expedited discovery schedule and hearing date on Plaintiffs' OTSC. (*See* ECF No. 13.) The Order provided that

"Plaintiff's OTSC Application shall be treated as a motion for a preliminary injunction, pursuant to Rule 65 of the Federal Rules of Civil Procedure..." (*Id.*) In addition, the Court's Order allowed the parties to engage in "narrowly tailored" discovery demands and up to two depositions for each "related to disputed facts at issue regarding Plaintiffs OTSC Application" (*Id.*)

On July 6, 2022, Defendants filed an opposition to Plaintiffs' motion. (ECF No. 29.) On July 23, 2022, Plaintiffs filed a reply in further support of their motion. (ECF No. 32.)

The Court held oral argument on Plaintiffs' motion for Preliminary Injunction on November 14, 2022. (ECF No. 57.)

## II. LEGAL STANDARD

A preliminary injunction is an "extraordinary remedy and should be granted only in limited circumstances." *Kos Pharms. Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (internal quotations omitted). To obtain a preliminary injunction, the movant must show: "(1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief." *Id.*

The Third Circuit has held that the movant bears the burden of establishing "the threshold for the first two 'most critical' factors." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017), as amended (June 26, 2017). "If these gateway factors are met, a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.*; accord *ADP, Inc. v. Levin, No. 21-2187, 2022 WL 1184202*, at *1 (3d Cir. Apr. 21, 2022).

## III. DISCUSSION

Jurisdiction exists under 28 U.S.C. §1332 because, as pleaded, Plaintiff Marine Electric is a citizen of Delaware and New Jersey. *See* 28 U.S.C. 1332(c)(1). Plaintiff Epstein is a citizen of New Jersey. Defendant MESF, as a limited liability company, has the citizenship of its members. None of the members of MESF are citizens of New Jersey or Delaware. The matter in controversy here exceeds the sum or value of $75,000, exclusive of interest and costs. Venue is proper pursuant to 28 U.S.C. §1391.

Plaintiffs assert that they have demonstrated immediate and irreparable harm if the Stock Sale of Epstein's equity interest in Marine Electric is permitted to go forward because Epstein would lose his entire ownership interest in and control over the company he has worked for and owned for 40 years. Additionally, Plaintiffs assert that Marine Electric is current on all its payment obligations to MESF therefore, MESF will suffer no undue prejudice because of any delays caused by the requested injunction. Plaintiffs argue that the balance of harm clearly weighs in favor of granting the temporary restraints that they seek. (*Id.*) This Court finds that Plaintiffs have satisfied their threshold burden to demonstrate the need for preliminary injunctive relief.

### A. Likelihood of Success on the Merits

To establish that it is likely to succeed on the merits of its claims, a plaintiff need not show that it is "more likely than not" to succeed. *Reilly v. City of Harrisburg,* 858 F.3d 173, 179 (3d Cir. 2017). Rather, a plaintiff need only show that there is a "reasonable chance, or probability, of winning." *Mallet and Co. Inc. v. Lacayo*, 16 F.4th 364, 380 (3d Cir. 2021) (quotation omitted). Plaintiffs have met the requisite showing in this case.

1. The Alleged Defaults

Defendants claim Marine Electric committed the following defaults: (1) failed to timely pay installments on the VentureSpire Loan due on August 11, 2021 and September 11, 2021, as a result the loan was accelerated on September 15, 2021, (ECF No. 29 at 9); (2) failed to pay the MESF Loan off by its maturity date, (*Id.* at 12); and (3) entered a $1.5 million SBA Loan without MESF's consent, (*Id.* at 13). The Court will address each alleged default in turn

a. The VentureSpire Loan

Defendants concede that VentureSpire did agree to provide Marine Electric with an extension of the August 11, 2021 payment, however, Defendants argue that there was no extension granted for the September 11, 2021 installment of the VentureSpire Loan. (ECF No. 29 at 25.)

In response, Plaintiffs claim that the delayed payment on the VentureSpire Loan was based on the assurances Hayes provided to both Weeber and Epstein that VentureSpire had agreed to permit Marine Electric to delay certain payments under the VentureSpire Loan until the supply chain issue was corrected. (ECF No. 32 at 7.) Plaintiffs note that as COO, Hayes regularly communicated with Ob and Morales concerning the financial affairs of Marine Electric. (ECF No. 28-1, Certification of Scott Weeber ("Weeber Cert.") ¶¶ 3-4; Deposition Transcript of Harry Epstein ("Epstein Dep.") 46:19–47:21.) During his June 29, 2022 Deposition, Weeber testified that by September 11, 2021, "it was common knowledge that Marine Electric had obtained an agreement from Ob to accept the payment late." (Deposition Transcript of Scott Weeber dated June 29, 2022 ("Weeber Dep.") 30:10–14; ECF No. 32 at 7-8.) Epstein asserts that he "was surprised to receive the [September 2021 Default Notice] regarding the VentureSpire Loan on September 17, 2021." (Epstein Dec. ¶ 8.) Plaintiffs state that Marine Electric's supply chain issue was rectified the following month, in October. As a result, the late payments for August and

September, including late fees, were paid to VentureSpire on October 7, 2021. (*Id.*) Plaintiffs have been current on the VentureSpire Loan ever since. (*Id.*)

b. The MESF Loan

Defendants argue that Marine Electric defaulted on the MESF Loan by failing to pay the indebtedness due by the January 2, 2022 maturity date of the loan. (ECF No. 29 at 34.)

Plaintiffs on the other hand assert that after receiving no response to the February 22, 2022 letter sent to MESF's counsel stating Marine Electric's intention to pay the MESF Loan in full (the "Payoff Letter"), Marine Electric paid MESF the total amount it believed was due on February 28, 2022. (Compl. ¶ 86; ECF No. 32-1, Ex. B, Deposition Transcript of J. Hayes dated June 30, 2022 ("Hayes Dep.") 83:7-12; Ex. 7 Payoff Letter.) Plaintiffs argue that Defendants have not alleged that the payoff amount calculations are incorrect; rather they claim, for the first time, that additional amounts are due for attorneys' fees and related interest. (ECF No. 32 at 11; Morales Dec. ¶ 19.) Plaintiffs assert that Defendants fail to provide any evidence that additional amounts are in fact due and owing on the MESF Loan. (ECF No. 32 at 11.) Additionally, Plaintiffs argue that even if additional amounts are owed, Defendants should not be allowed to rely on this to foreclose on the stock because Defendants acted in bad faith. (*Id.*) Plaintiffs note that implicit in the MESF Loan Agreement and the Pledge Agreement is the implied covenant of good faith and fair dealing, which attaches to every contract. *See* 6 Del. C. § 1-304; La. Rev. Stat. § 10:1-304 (UCC sections imposing an obligation of good faith in performance and enforcement of agreements). The MESF Loan Agreement requires Marine Electric to make certain payments on the MESF Note, including a balloon payment at the end of the note's maturity. (Compl. Ex. C.) The Pledge Agreement, which is referenced in the MESF Loan Agreement, requires MESF to, among other things, return the collateral to Epstein and execute "a proper instrument or instruments

acknowledging the termination" of the Pledge Agreement once the MESF Loan is paid off. (Compl. Ex. B, ¶ 18.) This implies that once Marine Electric communicated its intent to pay off the MESF Loan and provided MESF with a calculation of same, MESF was under an obligation to notify Marine Electric in good faith of the amounts that it believed were still due on the loan. Plaintiffs assert that in addition to failing to respond to the Payoff Letter, MESF failed to assert in the April 2022 Default Letter that there were any payment defaults or amounts still due under the MESF Loan. (Compl. Ex. H.) Plaintiffs therefore maintain that MESF should be estopped from now arguing that the MESF Loan was not paid off and satisfied. (ECF No. 32 at 8.) Consequently, Plaintiffs maintain that there is no default under the MESF Loan as Marine Electric completely paid it off as of February 28, 2022, before MESF sent its April 22, 2022 letter alleging a default. (*See* Compl., ¶ 38.)

c. The $1.5 million SBA Loan

Defendants argue that while MESF consented to Marine Electric applying for the SBA loan increase, (See ECF No. 29 at 19-20; Morales Dec. ¶ 26; Hayes Dep. 74:9–75:9), Marine Electric entered the $1.5 million SBA loan without the approval of the board of directors, in violation of the parties' the Second Amended Shareholders' Agreement. (ECF No. 29 at 19.)

Plaintiffs argue that it was only after the fact, when Morales realized that the SBA Loan would be used to pay off his MESF Loan, and not the VentureSpire Loan, that he raised any objection to the SBA Loan. (Hayes Dep. 74:9–75:9.) Plaintiffs further note that the purpose of Section 4.2(i) of the MESF Loan Agreement is to protect MESF's debt by ensuring that a new loan does not reduce the likelihood that Marine Electric is able to pay off the debt. (Compl., Ex. C, § 4.2(i).) Plaintiffs state that the SBA loan was used to pay off the MESF Loan in full. (ECF No. 32 at 14.) Plaintiffs claim that it was more beneficial to the company and its shareholders to pay down

the MESF Loan because it carried an 8%-higher interest rate than the VentureSpire Loan. (*Id.*) Plaintiffs claim that Morales changed his mind with respect to the SBA Loan because paying down the MESF Loan thwarts MESF's ability to foreclose on Epstein's Stock. (ECF No. 32 at 14.)

2. The Fifth Loan Modification

Defendants argue that the Fifth Loan Modification cross-collateralized the Loans, and that the Fifth Loan Modification is supported by the following consideration: a $7,750 advance made by MESF to Marine Electric, MESF agreed to a reduced interest rate on that advance and provided a payment extension of the due date of a prior $75,000 advance from October to January. (ECF No. 29 at 26; Weeber Dep. 23:13–15.) Thus, Defendants argue that by signing the Fifth Loan Modification, Epstein acknowledged that the Pledge Agreement secures both the MESF Loan and the VentureSpire Loan which, according to Defendants, was already in default. (*Id.*)

Plaintiffs argue that "[i]t makes no sense for a borrower to offer up additional collateral on a defaulted and accelerated loan unless the offer of additional collateral was for the purpose of resolving any alleged default." (ECF No. 32 at 9.) Plaintiffs note that Epstein believed the Fifth Loan Modification "cleared up all the defaults, if we call them defaults… [.]" (ECF No. 29-5, Deposition Transcript of H. Epstein dated June 28, 2022 ("Epstein Dep.") 95:18–21.) Further, Plaintiff's note that Epstein's testimony is supported by the language in the Fifth Loan Modification, which states that the Loans are "in full force and effect." (Compl., Ex. G ¶ 7.) Plaintiffs further argue that Defendants cannot have it both ways, either the Fifth Loan Modification did not cross-collateralize the Loans, or it did, and MESF waived the alleged default. (ECF No. 32 at 9.)

Plaintiffs further argue that even if a valid default existed under the VentureSpire Loan, "that default does not trigger MESF's default rights under the Pledge Agreement because the

Pledge Agreement was pledged as collateral for the MESF Loan, not the VentureSpire Loan. (ECF No. 28 at 148.) Plaintiffs also argue that MESF is further estopped from claiming a default due to its bad faith conduct. (*Id.* at 10.) Specifically, Plaintiffs claim MESF used its influence as a major stockholder and its control over Hayes to cause the alleged default of the VentureSpire Loan to take control of Marine Electric. (*Id.*)

3. The Stock Sale and Article 9 of the UCC

Plaintiff contends that the proposed Stock Sale violates Article 9 of the Delaware Uniform Commercial Code ("UCC"). Article 9 of the UCC requires a party collect or enforce obligations in a commercially reasonable manner. 6 Del. C. § 9–607(c). (ECF No. 28-1 at 150.) Plaintiffs argue that the proposed Stock Sale is not commercially reasonable because the default underlying the Stock Sale is invalid and was procured in bad faith and because the Stock Sale is not designed to maximize the value for the Stock. (ECF No. 32 at 17.) Further Plaintiffs assert that a secured creditor is expressly barred from selling collateral to itself by way of a private sale unless the Collateral is of a kind that is customarily sold on a recognized market or the subject of widely distributed standard price quotations. *See* 6 Del. C. § 9–610(c). (*Id.*) Plaintiffs argue that the Stock does not fall within this narrow exception. (*Id.*) Plaintiffs argues that MESF may not sell Epstein's Stock to VentureSpire via a private sale because VentureSpire is the de facto owner of the VentureSpire Note. (ECF No. 32 at 17.) A secured creditor is prohibited from purchasing its own collateral at a private sale unless it is of a kind of property with a readily identifiable market base. *See* 6 Del. C. § 9- 610(c). The Delaware Chancery Court has extended this rule to apply to secured creditors who attempt to sell collateral to an affiliate shell entity that is owned by the secured creditor. *Edgewater Growth Cap. Partners LP v. H.I.G. Cap., Inc.*, 68 A.3d 197, 211 n.70 (Del. Ch. 2013). Here, even though VentureSpire is no longer the legal holder of the VentureSpire Loan,

it is the de facto owner by virtue of the terms governing the assignment set forth in the Promissory Loan Agreement. Plaintiffs maintain MESF's status as the holder of the VentureSpire Loan is completely illusory because MESF is under no obligation to make any payments to VentureSpire unless Marine Electric makes payments to MESF therefore, MESF functions as a mere "passthrough." (Epstein Dec., Ex. 5, § 1.5; ECF No. 29, Exhibit C, Deposition Transcript of Walter Morales dated June 30, 2022 ("Morales Dep.") 97:17–25.) Additionally, Plaintiffs claim that the Promissory Loan Agreement provides that the VentureSpire Loan transfers back to VentureSpire once MESF forecloses on the stock. (Epstein Dec., Ex. 5, § 1.5.) Accordingly, VentureSpire purchasing Epstein's Stock at a private sale is akin to a holder of the loan purchasing its own collateral, which violates UCC section 9 – 610(c). (*Id.* at 18.)

Here, the Court finds that Plaintiffs have met the requisite showing of likelihood of success on the merits of their claims. Plaintiffs have sufficiently alleged that Defendant MESF waived its right to rely on the alleged defaults based on its course of conduct and bad faith. Specifically, Plaintiffs alleged that (1) for a month, MESF concealed from Marine Electric that MESF had become the holder of the VentureSpire Loan on September 16, 2021, while Morales was seemingly attempting to help Epstein negotiate a forbearance with VentureSpire; (2) despite the alleged default of the VentureSpire Loan, MESF, through VentureSpire, continued to loan Marine Electric money by providing a $75,000 loan in September 2021; (3) when Morales finally revealed that the VentureSpire Loan had been assigned to MESF, he presented Marine Electric with the Fifth Loan Modification and Epstein signed it with the reasonable belief that it "cleared up" the alleged defaults; (4) MESF failed to respond to the Payoff Letter sent by Marine Electric communicating its intent to pay off the MESF Loan or notify Marine Electric that there were any payment defaults or amounts still due under the MESF Loan; and (5) after it acquired the VentureSpire Loan, MESF

continued to accept payments on the loan and entered into the Fifth Loan Modification with Marine Electric and never notified Marine Electric that it retained the right to enforce the Default Notice. Then, MESF sent the April 2022 Default Notice notifying Marine Electric that it was exercising its contractual and statutory right to foreclose on Epstein's equity interest in Marine Electric based on the alleged defaults on the Loans.

Plaintiffs have demonstrated at the initial pleading stage that they justifiably relied on Defendants' assurances that they would accept the two late payments for August and September of 2021. This coupled with the fact that MESF had become the owner of the VentureSpire Loan, while Morales "seemingly" assisted Epstein negotiate a forbearance with VentureSpire bolsters Plaintiff's position. Plaintiffs' position is further supported by the absence of any cross-collateralization language in the Fifth Loan Modification. Accordingly, Plaintiffs have shown a "reasonable chance or probability of of winning." *Mallet and Co. Inc.,* 16 F.4th at 380.

**B. Irreparable Harm**

Next, to demonstrate irreparable harm, a movant has the burden of establishing a "clear showing of immediate *irreparable* injury." *Louis v. Bledsoe*, 438 F. App'x 129, 131 (3d Cir. 2011) (citation omitted) (emphasis added). "Establishing a risk of irreparable harm is not enough [to warrant a preliminary injunction]." *ECRI,* 809 F.2d at 226. Moreover, "the injury created by a failure to issue the requested injunction must be of a peculiar nature, so that compensation in money cannot atone for it." *Acierno v. New Castle City.*, 40 F.3d 645, 653 (3d Cir. 1994) (internal quotation marks and citation omitted). The Third Circuit has repeatedly stated that "the preliminary injunction device should not be exercised unless the moving party shows that it specifically and personally risks irreparable harm." *Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.*, 562 F.3d 553, 557 (3d Cir. 2009) (citing *Adams v. Freedom Forge Corp.,* 204 F.3d 475, 487 (3d Cir.2000)).

Economic injury, compensable in money, cannot satisfy the irreparable injury requirement. *Id.* (citation omitted). Where a plaintiff fails to adduce proof of actual or imminent harm which otherwise cannot be compensated by money damages, an injunction cannot issue. *Id.* The preliminary injunction must be the only way of protecting the plaintiffs from harm. *See Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797 (3d Cir. 1989) (citations omitted). The United States Supreme Court has clarified irreparable harm as follows:

> [I]t seems clear that the temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury.... 'The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.'

*Sampson v. Murray,* 415 U.S. 61, 90, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974) (quoting *Virginia Petroleum Jobbers Assn. v. FPC,* 259 F.2d 921, 925 (D.C.Cir.1958)). "The requisite for injunctive relief has been characterized as a 'clear showing of immediate irreparable injury,' or a 'presently existing actual threat; [an injunction] may not be used simply to eliminate a possibility of a remote future injury.'" *Id.*

The loss of business and good will, and the threatened loss of the enterprise itself, constitute irreparable injury to the plaintiff sufficient to justify the issuance of preliminary injunction "*See Golden Fortune Imp. & Exp. Corp. v. Mei-Xin Ltd.*, No. 22-1710, 2022 WL 3536494, at *6 (3d Cir. Aug. 5, 2022); *see also Carlo C. Gelardi Corp. v. Miller Brewing Co.,* 421 F.Supp. 233, 236 (D.N.J. 1976; *Semmes Motors, Inc. v. Ford Motor Co.,* 429 F.2d 1197, 1205 (2d Cir. 1970).

Here, Plaintiffs allege in the Verified Complaint that if a preliminary injunction is not granted, Epstein will suffer immediate irreparable harm because he will lose ownership interest and control rights in Marine Electric as a majority stockholder and CEO. This is not the case where

the harm suffered would be quantifiable by monetary damages. Epstein, in addition to his equity ownership in Marine Electric also stands to lose his loss control rights as a CEO and employee. That harm "cannot be measured entirely in monetary terms." *Semmes Motors*, 429 F.2d at 1205 (right to continue business "is not measurable entirely in monetary terms"). Plaintiff seeks a preliminary injunction to maintain the status quo pending an ultimate resolution of this litigation. The Court finds that these allegations are sufficient to support a finding of irreparable harm at this stage of the litigation.

**C. The Balance of the Relative Harms**

Plaintiffs claim in the Verified Complaint that Defendants engaged in a conspiracy to usurp control of Plaintiffs company. Plaintiffs have shown probability of ultimate success on the merits and irreparable harm as Epstein stands to lose his equity ownership in Marine Electric and his loss control rights as a director, CEO, and employee.

In contrast, while Defendants contend that Epstein's leadership is harming the company, Marine Electric has not missed a payment under the VentureSpire Loan or any other loan since September 2021. Marine Electric continues to provide MESF with monthly financial statements and information concerning Marine Electric's finances and operations, consistent with its obligations under the loan agreements. If the Court issues the relief requested, the only harm that Defendants or any other interested parties will suffer is delay in being able to sell Epstein's Stock, presumably to VentureSpire for $10,000. (*See* ECF No. 29 at 36.) Here, the Court finds that Plaintiffs' request for restraints is narrowly tailored— Plaintiffs seek only to prevent MESF from completing the Stock Sale or otherwise take action against Marine Electric until the parties have had a chance to litigate the issues concerning the alleged default and whether the Stock secures the

VentureSpire Loan indebtedness. Accordingly, the Court finds that the balance of harms weighs heavily in favor of Plaintiffs.

**D. The Public Interest**

The final factor the Court must consider is whether issuance of an injunction would be in the public's interest. Where a party demonstrates both the likelihood of success on the merits and irreparable injury, "it almost always will be the case that the public interest will favor" the issuance of an injunction. *Marsellis-Warner Corp. v. Rabens*, 51 F. Supp. 2d 508, 532–33 (D.N.J. 1999) (citing *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 n.8 (3d Cir. 1994)). Here, the Court finds that no public interest will be harmed by the injunction. Rather, the public interest lies in favor of granting an injunction as the public has a clear interest in ensuring fair business practices.

**E. Security Bond**

Finally, a prerequisite to issuance of injunctive relief is that Plaintiffs post a bond "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c); *see also Hope v. Warden York Cnty. Prison*, 972 F.3d 310, 322 (3d Cir. 2020). Federal Rule of Civil Procedure 65(c) states that a "court may issue a preliminary injunction ... only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined...." Fed. R. Civ. P. 65(c). While, the posting of a bond is rarely discretionary, "[t]he amount of the bond is left to the discretion of court." *Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 210 (3d Cir. 1990).

The Court first notes that neither party addressed the bond requirement, let alone provide an estimate of the amount of such a bond in their respective briefing. The issue was first addressed

during oral argument when Defendants asked that if the Court were to grant Plaintiffs' Motion, that the bond be set at $1 million. The Court notes, however, that a bond is only justified to the extent necessary to secure the price of a wrongfully issued injunction. *Sprint Commc'ns Co. v. CAT Commc'ns Int'l, Inc.*, 335 F.3d 235, 240 (3d Cir. 2003). By Defendants' own account, the harm that they stand to suffer by being enjoined from moving forward with foreclosure on Epstein's equity interest in Marine Electric includes maintaining Epstein on payroll and the $10,000 loss of the sale of Epstein's stock to VentureSpire. (ECF No. 29 at 36.) The Court finds that some amount of security is required and equitable and the Court has endeavored to set that amount on the record before it. The Court does not view Epstein's compensation as a "loss" based on the record. The Court finds that security in the amount of $50,000 deposited with the Clerk of the Court satisfies Rule 65(c) on the present record.

## IV. CONCLUSION

For all of the foregoing reasons, the Court grants Plaintiffs' motion for a Preliminary Injunction pursuant to Fed. R. Civ. P. 65. The Court concludes that a security bond in the amount of $50,000 is appropriate.

An appropriate Order accompanies this Opinion.

**DATED: December 6, 2022**

**JULIEN XAVIER NEALS**
**United States District Judge**